UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ROY C. CASEY                                                              CIVIL ACTION

VERSUS                                                                    NO: 09-6681-JCZ-KWR

GUITAR CENTER, INC. et al

### REPORT AND RECOMMENDATION

The motion of the plaintiff, Roy C. Casey ("Casey"), for summary judgment to enforce the September 28, 2010 compromise was referred to the undersigned Magistrate Judge. Rec. doc. 109.

### BACKGROUND

On September 14, 2009, Casey filed a petition in state court against Guitar Center, Inc. and Guitar Center Stores, Inc. (collectively "Guitar Center") for claims under state law. Rec. doc. 1 (Attachment). The defendants alleged that there was jurisdiction pursuant to 28 U.S.C. § 1332 and removed the petition to federal court. Rec. doc. 1. Casey's motion for preliminary injunction was denied. Rec. doc. 24. The parties were unable to reach a settlement at a May 10, 2010 conference with the District Judge. Rec. doc. 43. On June 28, 2010, there was settlement conference before the assigned Magistrate Judge, but the negotiations were unsuccessful. Rec. doc. 70. The defendants' motion for summary judgment was denied. Rec. doc. 73. On July 13, 2010, the trial was reset for February 22, 2011. Rec. docs. 83 and 85.

On or about August 20, 2011, counsel for the parties asked that the Court conduct a settlement conference. It was set for September 28, 2010. Rec. doc. 91. The settlement conference lasted more than seven hours. The following individuals participated in the conference:

Casey, plaintiff;

>Rob Couhig and Jonathan Lemann, counsel for Casey;
>
>Lee Smith and Ellen Rosenberg, representatives of Guitar Center; and
>
>Harry Rosenberg, counsel for Guitar Center.

A settlement was reached. Its terms were dictated into the record. Rec. doc. 113.

>Mr. Rosenberg began by reciting the defendants' understanding of the settlement agreement.

Id. at 3-5. Mr. Couhig raised an issue. Mr. Rosenberg and his clients responded, id. at 5-6, at which point the following occurred:

>THE COURT: I need for you guys to be crystal clear here.
>
>MS. ROSENBERG: Uh-huh.
>
>THE COURT: Because what we're doing is settling the case, and we're not walking into a new lawsuit.
>
>MS. ROSENBERG: Uh-huh.
>
>MR. SMITH: Correct.
>
>MS. ROSENBERG: Right.
>
>THE COURT: So, let's be crystal clear about what the issue is.
>
>MS. ROSENBERG: Uh-huh.
>
>THE COURT: And what the resolution of the issue is.

Id. at 6-7. There were further statements concerning the terms of the settlement. The following exchange concluded the settlement agreement:

>THE COURT: Now Mr. Casey, you have listened carefully to the issues as outlined by Mr. Rosenberg, and you have asked for a couple of clarifications and one modification, the modification being the payment terms, which they are going to try to accommodate you on. The clarification has been agreed to by you and by Mr. Couhig, is that correct?

| | |
|---|---|
| MR. CASEY | Yes. |
| THE COURT: | All right. You have entered into this agreement willingly, that is that no one has coerced you into this settlement, is that correct? |
| MR. CASEY: | Correct. |
| THE COURT: | You understand that beyond this evening, your case against Guitar Center, Inc., et al will be at an end, only subject to funding and to the final execution of the settlement agreement, is that correct. |
| MR. CASEY: | Yes. |
| THE COURT: | And you will, following funding of the agreement, instruct your attorney to dismiss the case with prejudice? |
| MR. CASEY: | Yes. |
| THE COURT: | That means you understand that all of your rights against Guitar Center, Inc. arising out of any of the contracts that you had with Guitar Center, Inc. are extinguished? |
| MR. CASEY: | Yes. |
| THE COURT: | All right. You may never come back and re-allege any of the claims that you could have asserted in this litigation. |
| MR. CASEY: | Yes. |
| THE COURT: | All right. And again, you do so willingly and without coercion after having consulted with your attorneys? |
| MR. CASEY: | Yes. |

Id. at 12-13. Counsel for Mr. Casey also acknowledged his agreement. A minute entry was issued reporting that the case was settled. Rec. doc. 97. On October 1, 2010, the District Judge signed an order of dismissal. Rec. doc. 98.

On November 30, 2011, Casey filed a motion for summary judgment to enforce the

3

September 28, 2010 compromise which provided that he would be paid a commission of five percent on extended warranty sales. Casey raises six issues.

1.  He reports that Guitar Center, Inc. is a parent company with many affiliates, including various subsidiaries, plus various divisions, brand channels, sales channels and business segments which currently operate store fronts under two different flags (Guitar Center with 225 stores and the Music & Arts Center with 99 stores) and five internet sites that sell products on a different response basis. He contends that "his agreement with Defendants specifically included all affiliates of Guitar Center Stores, Inc., except for warranty sales from MusiciansFriend.com. . . ." Rec. doc. 104 at 4. Guitar Center contends that Casey is not entitled to any amounts from its affiliates. Casey's position increases the volume of extended warranty sales on which the commission is calculated.

2.  Casey contends that "the parties agreed that he would receive ten years of payments on both Renewal sales and Aftermarket sales, while the Defendants contend that the settlement agreement was limited to Aftermarket sales and did not include Renewal sales." Id at 4. Casey also received three percent on certain sales. Casey's position would increase the volume of sales on which the three percent payment is determined.

3.  Casey contends that the definition of costs is the sum of all expenses incurred by defendants to insure and administer the program. Guitar Center contends that the definition of costs is limited to the amount it pays a third party to administer the program. It urges that Casey is not entitled to payments based on actual costs if Guitar Center self-administers the extended warranty program. Guitar Center's position appears to lead to the conclusion that in the event it chooses to self-administer the extended warranty program, the five percent commission payments to Casey

4

cease.

4. Casey contends that consistent with the past practice he ought to receive monthly documentation of the commission payments. Guitar Center contends that it is obligated to provide Casey with back-up information if the payments in a year fall below $550,000 and then only annually. If the cap is reached, there is no obligation to provide any information to Casey to support the calculation of the commission payments.

5. Casey contends that he is to receive ten years of commission payments without regard to whether there is an interruption in the sale of warranties. Instead, the defendants want an end date of September 30, 2019 which would apply even if there were gaps in the sale of warranties.

6. Casey contends that his right to assign his rights is unrestricted. The defendants contend that in view of the proprietary information which might be disclosed to Casey in conjunction with the commission payments, the permitted assignees are Casey's immediate family or a trust for such a family member. They contend they did not agree to let Casey assign his rights to a competitor of the defendants.

## APPLICABLE LAW

Fed. R. Civ. P. 56 provides in pertinent part that summary judgment will be granted when "... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). Lujan v. National Wildlife Federation, 497 U.S. 871, 889, 110 S.Ct. 3177, 3189 (1990).

Pursuant to Guidry v. Halliburton Geophysical Services, Inc., 976 F.2d 938, 940 (5th Cir.

1992), a settlement agreement is a contract and the court is to enforce one as it would a contract. Where the settlement agreement is based on a state law claim, the construction and enforcement of the settlement agreement is governed by the principles of state law applicable to contracts generally. Lockette v. Greyhound Lines, Inc., 817 F.2d 1182, 1185 (5th Cir. 1987). "A compromise is a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship." La. Civ. Code Ann. art. 3071 (2007).

Casey contends that extrinsic evidence of the prior contractual relationship between the parties should be considered to determine what meaning should be given to the September 28, 2010 settlement agreement. Rec. doc. 104 at 8.

"Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code Ann. art. 2045 (1985). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code Ann. art. 2046 (1985).

> A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.

La. Civ. Code Ann. art. 2053 (1985). The Fifth Circuit's rule is similar.

> A settlement agreement is a contract. A district court's interpretation of an unambiguous contract is a question of law, subject to *de novo* review. This standard applies to all unambiguous contracts, oral as well as written. Where an agreement is ambiguous, such that its construction turns on a consideration of extrinsic evidence, the district court's interpretation is reviewed for clear error. The initial determination that the ambiguous nature of a contract warrants the introduction of extrinsic evidence is itself a question of law.

Guidry, 976 F.2d at 940 (citations omitted). Extrinsic evidence will only be considered where there

is a doubtful provision in the September 28, 2010 settlement agreement

## ANALYSIS

**A.      Affiliates.**

Casey contends that his commission payment must be determined from the cost of goods sold for all sales by Guitar Center and its affiliates other than MusciansFriends.com. He seeks an order requiring Guitar Center to pay him a commission payment based upon:

> [W]arranty sales from all current affiliates, divisions, sales or brand channels (other than MusiciansFriend.com) and future affiliates or divisions that are not selling extended warranties at the time Guitar Center signs an agreement to purchase the new affiliate or division.

Rec. doc. 104 at 11. Guitar Center responds that Casey's commission payments are determined from the cost of goods sold for all sales by the Guitar Center Brand Channel which includes only Guitar Center branded stores and www.guitarcenter.com.

Mr. Rosenberg's statement of the defendants' understanding of the settlement agreement contains the follows:

> [The commission] payments would be based upon five percent against the - - which would be a commission using the cost of goods as a multiplier against the five percent; that that would be paid for the warranties or the cost of goods sold by Guitar Center, retail. . . .

Rec. doc. 113 at page 4, lines 10-12. Mr. Couhig sought clarification and stated,

> [I]t's on the same basis as they were previously done, that is, that generation of those warranty payments as previous, whether it's Guitar Center or its <u>affiliates</u> or what have you, correct?"

Id. at page 5, lines 12-14 (emphasis added). This is the only place in the transcript of the settlement agreement where "affiliates" appears. Guitar Center and its counsel did not respond. Mr. Couhig asked a further question: "Are we changing that from the way it used to be?" Id. at page 5, lines 16-

7

17. The focus of Mr. Rosenberg's reply concerned the cost of goods sold for Guitar. Id. at page 5-line 20 to page 6-line 4. When he responded to Mr. Couhig's request for clarification (Rec. doc. 113 at page 9, lines 9-15), he referred to "the cost of goods to Guitar Center under the existing contract." Id. at lines 22-23 (emphasis added). Mr. Couhig replied, "[o]kay, as long as it's consistent what the existing contract - -" Id. at lines 24-25. Mr. Rosenberg replied:

> Well, when I say the existing contract, with Guitar Center's existing contract with N.E.W., the administrator, yes. It's the cost of goods for Guitar Center.

Id. at page 6, lines 1-4. It is clear that the terms "cost of goods" or "cost of goods sold" as used in the settlement agreement refer to the cost of goods sold for Guitar Center under its contract with N.E.W.

After brief exchanges by Mr. Couhig, Mr. Rosenberg and the Guitar Center representatives, the Court interjected with the need for the parties to be "crystal clear." Notwithstanding this instruction and a brief off-the-record discussion, Mr. Casey raised only two issues: (1) whether the payments would be monthly or quarterly; and (2) whether the payments to the administrator would be the basis for the five percent and vendor credits would not be subtracted from those payments before the calculation is made. Id. at page 9, lines 3-13. His only concern about "cost of goods sold" was that it not be reduced for vendor credits. Mr. Casey did not say anything about affiliates. His statement that "the payments to the administrator would be the basis of the five percent . . ." also demonstrates that cost of goods sold refers to the cost of goods sold for Guitar Center under its contract with N.E.W. Id. at page 9, lines 6-7. The defendants report that the existing contract with N.E.W. expressly excludes all of Guitar Center's affiliates. Rec. doc. 114 at 8.

The September 28, 2010 agreement does not refer to affiliates. Although Mr. Couhig mentioned "affiliates," Mr. Rosenberg clearly stated that the commission payments would be

8

determined by multiplying five percent by the cost of goods sold for Guitar Center under its existing contract with N.E.W.  Notwithstanding its obvious importance, Mr. Casey said he had not read the N.E.W. contract.  Id. at page 9, lines 11-13.  After the Court enjoined him to state clearly his objections, he said nothing about affiliates.

The words of the September 28, 2010 settlement agreement are clear and explicit and do not lead to absurd consequence.  "Cost of goods sold" is limited by the N.E.W. contract.  It does not include the cost of goods sold by any of the affiliates by Guitar Center.

In support of his contention that cost of goods sold includes not only the cost of goods sold for Guitar Center but also the cost of goods sold for all of its affiliates, except for warranty sales from MusiciansFriend.com, Casey cites: (1)  his independent contractor agreement with Guitar Center; (2) the original agreement between Guitar Center and Aon, the first administrator for the extended warranty program; (3) Guitar Center's SEC filings; and (4) his original petition.  It is not necessary to resort to this extrinsic evidence to determine the meaning of cost of good sold by Guitar Center.

Guitar Center contends that by including the word "retail" to modify Guitar Center, the agreement included only sales made by Guitar Center Brand Channel.  This is not supported by the terms of the settlement agreement.  The settlement agreement requires the parties to refer to the N.E.W. contract to determine the cost of goods sold from which the five percent commission payment is calculated.

**B.      Whether Paid to Third Party or Not.**

Casey reports that: (1) when the warranty program began, Guitar Center contracted with Aon to administer the program; and (2) at the conclusion of the Aon contract, Guitar Center entered into a five-year contract with N.E.W. to administer the program. The cost of the program is what the administrator, N.E.W., charges without any deductions for vendor credits; for example, promotional funds. Casey is concerned about what happens under the settlement agreement if Guitar Center takes the administration of the program in-house at the end of the N.E.W. contract.

Guitar Center contends that there was no discussion at the settlement conference on what payment, if any, would be made to Casey in the event Guitar Center elected to self-administer the program. It urges that Casey understood the payment would be based on the amounts paid by Guitar Center to a third party administrator.

There is no basis to conclude that the settlement agreement provides that the commission payments cease if Guitar Center elects to self-administer the program. The commission payments only ceases if Guitar Center terminates the program and self-administration is not termination of the program. If Guitar Center is suggesting it is, this is an absurd consequence.

The provision at issue, cost of goods, shall be interpreted to maintain Guitar Center's obligation in the event it chooses to self-administer the program during the term of the settlement agreement. If Guitar Center self-administers the program, the commission payments will be five percent of Guitar Center's actual cost of goods sold for the extended warranty program. Based on the resolution of the "affiliates" issue, the cost of goods sold for a self-administered extended warranty program shall be determined with reference to Guitar Center's sales from all outlets covered by the N.E.W. contract at the time of its expiration.

### C. **Renewal Sales.**

Mr. Rosenberg's statement of the defendants' understanding of the settlement agreement included, "which cap would exclude the three percent of after-market payments under the after market clause payments in the prior agreement with Mr. Casey. . . ." Rec. doc. 113 at page 4, lines 13-16. Casey contends this includes renewals as well as after market sales. He cites his original petition in which renewal sales and after market sales are included. Rec. doc. 104 at 16.

There is no reference anywhere in the settlement agreement to renewal sales or renewals. The clear and explicit language of the settlement agreement demonstrates that the cap excluded the three percent of after-market payments. It did not exclude renewal sales. This does not lead to an absurd result.

### D. **Monthly records.**

Casey contends that the Aon-Guitar Center agreement provided for monthly records. He urges that there is no reason why this should not be carried forward into the settlement agreement. This ignores the obvious fact that the parties made no provision in the settlement agreement for production of records to Casey. Guitar Center contends that as long the commission payments reach the cap, Casey has no need for any records. This is consistent with the absence of any provision for production of records. Guitar Center recognizes that if the commission payments do not exceed the annual cap, it will have to provide an accounting to Casey. The language of the settlement agreement is clear and it does not lead to an absurd result.

### E. **Termination Date.**

Mr. Rosenberg's statement of the defendants' understanding begins, "Guitar Center would pay or cause to be paid to Roy Casey . . . a sum of money beginning on October 1, 2009 for a period

11

of ten years. . . ." Rec. doc. 113 at page 4, lines 5-7. Casey contends that he is to receive ten years of commissions without regard to whether there is an interruption of the warranty program. Guitar Center contends that the term of the agreement ends on September 30, 2019. If so, the last payment would be either for the quarter ending September 30, 2019 or the month ending September 30, 2019, and such payment would be made by no later than 45 days after the end of the quarter or month. The words of the settlement agreement regarding its duration are clear.

If there is an interruption in the program, Casey contends that the running of the ten years is suspended until the program resumes. Such a provision is not part of the agreement. Because Guitar Center can terminate the commission payments before the expiration of ten years by terminating the extended warranty program, there is no basis to argue that a suspension of the program should lead to an extension of the term of the settlement agreement. The language of the settlement agreement does not produce an absurd consequence.

**F.     Assignment.**

Mr. Rosenberg's statement of the defendants' understanding begins, "Guitar Center would pay or cause to be paid to Roy Casey or his heirs, successors and assigns a sum of money. . . ." Rec. doc. 113 at page 4, lines 5-6. The defendants contend that in view of the proprietary information which might be disclosed to Casey in conjunction with the payments, the permitted assignees are Casey's immediate family or a trust for such a family member. Guitar Center's position ignores the fact that there is no limitation on Casey's right to assign the settlement agreement. Its position would require reading in a limitation where none exists. The language of the settlement agreement is clear and does not lead to absurd consequences. Guitar Center is required to provide documentation only if the commission payments do not meet the cap. If Casey assigns the

settlement agreement to a competitor, Guitar Center can avoid releasing any information by payment of the cap or it can terminate the agreement by terminating the warranty program.

## **SETTLEMENT AGREEMENT**

Based on the settlement conference of September 28, 2010 and resolution of the issues raised by Casey, the parties agreed as follows:

1. Beginning on October 1, 2009 and for a period of ten years through September 30, 2019, Guitar Center shall pay or cause to be paid to Casey or his heirs, successors and assigns a commission not to exceed $550,000.00 per year.

2. The three percent after-market payments provided for in the after-markets clause in the prior agreement between Casey and Guitar Center shall be excluded from the cap on commission payments. After-market payments do not include renewal sales or renewals.

3. Casey is not be obligated to perform any services for Guitar Center as result of this settlement agreement.

4. If the extended warranty program under which Casey will receive payments is terminated by Guitar Center, Casey's commission payments shall cease.

5. The commission payments shall be paid within 45 days of each calendar quarter of the year. Guitar Center shall make a good faith effort to accommodate Casey's request that the commission payments be made monthly.

6. The first commission payment shall be paid by November 15, 2010.

7. The commission payments shall be determined by multiplying the cost of goods sold by Guitar Center by five percent.

    a. Cost of goods sold refers to Guitar Center's payments under its existing contract with

13

        N.E.W;

    b.    Cost of goods sold shall be determined without any deductions for vendor credits, for example promotional funds;

    c.    Cost of goods sold does not include the cost of goods sold by any of the affiliates of Guitar Center.

8. If Guitar Center chooses to self-administer the program during the term of the settlement agreement, the commission payments shall be five percent of Guitar Center's actual cost of goods sold for the extended warranty program with actual cost of goods sold determined with reference to Guitar Center's sales from all outlets covered by the N.E.W. contract at the time of its expiration.

9. In consideration for Guitar Center's obligations in this settlement agreement, Casey shall dismiss with prejudice this lawsuit with each party to bear its own costs and attorneys' fees.

## **RECOMMENDATION**

It is recommended as follows:

1. Casey's motion for summary judgment for summary judgment to enforce September 28, 2010 compromise (Rec. doc. 104) be GRANTED in PART and DENIED in PART as provided herein:

2. Casey and Guitar Center shall comply with the terms of the settlement agreement as described herein.

3. **Within fourteen (14) calendar days of the entry of the order accepting this recommendation**, Guitar Center shall pay Casey the commission payments owed for October 1, 2009 through December 31, 2010.

4. If any further quarterly commission payments are due under part 5 of the settlement agreement when the District Court enters the order approving this recommendation, **such payments shall be made within fourteen (14) calendar days of the entry of such order**.

5. **Within seven (7) calendar days of the receipt of the payments described in parts 3 and 4 above**, Casey shall file a motion to dismiss this action with prejudice each party to bear its own costs and attorneys' fees.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 14th day of February, 2011.

**SALLY SHUSHAN**
**United States Magistrate Judge**